** NOT PRINTED FOR PUBLICATION **

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| AFFINITY LABS OF TEXAS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION No. 1-12-CV-557 |
| v. | § | |
| | § | JUDGE RON CLARK |
| SAMSUNG ELECTRONICS | § | |
| COMPANY, et al., | § | |
| | § | |
| *Defendants.* | § | |

**ORDER CONSTRUING TERMS OF UNITED STATES PATENT NOS. 7,324,833 AND 7,624,228**

Plaintiff Affinity Labs of Texas, LLC sued Defendants Samsung, HTC, and LG

(collectively "Defendants") alleging infringement of United States Patent Nos. 7,324,833 and

7,634,228.  This court has previously construed both of these patents in prior litigation involving

Plaintiff Affinity and other automobile manufacturers.  *See Affinity Labs of Tex., LLC v. BMW N.*

*Am.*, LLC, 9-08-cv-164, Doc # 326 (construing the '833 patent), Doc. # 386 (construing the '228

patent) (hereinafter "*Affinity v. BMW*").  On January 10, 2014, the court conducted a *Markman*

hearing to assist it in interpreting the meaning of disputed claim terms.[1]  Having considered the

patents, the parties' contentions as presented in their briefs and the arguments of counsel, the

---

[1] The transcript of the January 10, 2014 *Markman* hearing contains a number of representations
by and agreements of the parties, as well as answers by their experts to technical questions from
the court, all of which will not be repeated here, but which may assist in understanding the issues
presented.  This Order governs in the event of any conflict between the Order and the court's
preliminary analysis at the hearing.  Several Court's Exhibits were discussed at the hearing and
are part of the record at Doc. # 155.  These exhibits will be cited in this Order at "Ct.'s Ex. __."

court now makes the following findings and construes the disputed claim terms.[2]  The parties have agreed on the constructions of many of the terms, which have been entered as a separate Order.  Doc. # 161.

## I.   Claim Construction Standard of Review

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc. (Markman II)*, 517 U.S. 370, 388-91, 116 S. Ct. 1384, 1395-96 (1996); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998).  "The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly."  *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555(Fed. Cir. 1995).  "'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "Because the patentee is required to 'define precisely what his invention is,' … it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'"  *Id.* (quoting *White v. Dunbar*, 119 U.S. 47, 7 S. Ct. 72, 75 (1886)).

The intrinsic evidence, that is, the patent's specification and, if in evidence, the prosecution history, is important in claim construction.  *See id.* at 1315-17.  "[T]he specification

---

[2] As in the previous *Markman* hearings in the prior case, the court appointed Dr. Frank Shipman as a technical advisor.  Doc. # 135.  Dr. Shipman received his doctorate in computer science from the University of Colorado in 1993.  He also has an M.S. in computer science from the University of Colorado and a B.S. in Electrical Engineering from Rice University.  He has been on the faculty of Texas A&M University since 1995, where his research interests include intelligent user interfaces, hypertext, computers and education, multimedia, new media, computers and design, computer-human interaction, and computer-supported cooperative work.  More information about his publications and awards may be found on his curriculum vitae, which is available at http://www.csdl.tamu.edu/~shipman/vitae.pdf.

'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The patent specification and the prosecution history may clarify the definition of terms used in the claims, or may show that the patentee has clearly disavowed the ordinary meaning of a term in favor of some special meaning.  *See Markman v. Westview Instruments, Inc. (Markman 1)*, 52 F.3d 967, 979-80 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384 (1996).

A claim term takes on its ordinary and accustomed meaning unless the patentee demonstrated an express intent to impart a novel meaning by redefining the term "with reasonable clarity, deliberateness, and precision" in the patent specification or prosecution history.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  The patentee may demonstrate an intent to deviate from the ordinary meaning "by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."  *Id.* at 1327.  If the patentee clearly intended to provide his own definitions for claim terms, the "inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316.

In addition to the intrinsic evidence, a court is also authorized to review extrinsic evidence, such as dictionaries, inventor testimony, and learned treatises.  *Id.* at 1317.  For instance, in some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction … involves little more than the widely accepted meaning of commonly understood words"; a general purpose dictionary may be helpful in these instances.  *Id.* at 1314.  However, extrinsic evidence is "in general less reliable" than the intrinsic evidence in determining how to read claim terms.

3

*Id.* at 1318.  Therefore, while extrinsic evidence may be used to help educate the court regarding the field of the invention and what a person of ordinary skill in the art would understand claim terms to mean, extrinsic evidence should be considered in the context of the intrinsic evidence in order to result in a reliable interpretation of claim scope.  *Id.* at 1319.

As discussed above, both of the patents-in-suit were previously construed by this court. In the previous case, counsel for Plaintiff Affinity made various factual and legal statements about the patent, the prosecution history, and proposed construction.  While there is general agreement in the circuits that litigants cannot make contrary factual statements, judicial estoppel with regard to legal conclusions is less settled.  *Transclean Corp. v. Jiffy Lube Int'l*, 474 F.3d 1298, 1307 (Fed. Cir. 2007).  As this matter is not unique to patent law, the law of the regional circuit governs the extent of judicial estoppel in patent cases.  *Id.* at 1304.  In the Fifth Circuit, "judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding."  *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996).  "The doctrine prevents internal inconsistency, precludes litigants from 'playing fast and loose' with the courts, and prohibits parties from deliberately changing positions based upon the exigencies of the moment."  *Id.*

## II.      Patent Background and Technology

Both the '833 and the '228 patents are continuations of, and have the same specification as, U.S. Patent No. 7,187,947.  The patents-in-suit are directed toward a system and method for

connecting and integrating a portable electronic device ("PED"), such as an MP3 player, with a second electronic device, such as a car's sound system.[3]

The PED communicates metadata – i.e. information about a particular data set that may describe how, when, and by whom the data set was created, accessed, or modified; its size; and how it was formatted – to the second electronic device.  This metadata may include information about sound, artist, album, and playlist names.  The metadata is used by the second electronic device to create a graphical user interface ("GUI") that is shown on the device's display.  The second electronic device can then be used to select and play audio and media files stored on the PED, using "soft buttons" on the GUI.

### III.   Person Having Ordinary Skill in the Art

The words of a claim are generally given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312.  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1313.  Analyzing how a person having ordinary skill in the art ("PHOSITA") understands a claim term is the starting point of claim interpretation.  *Id.*  A PHOSITA is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

---

[3] Many of the patent claims refer to a "portable electronic device" or a "portable hand-held device" that may communicate information to a "different electronic device" or another "electronic device."  As agreed by the parties, "portable electronic device," "PED," "portable hand-held device," and "first electronic device" were used interchangeably at the claim construction hearing.  Markman Hearing Transcript, Doc. # 174 [hereinafter "Tr."] at pp. 13-14.  The court will continue to refer to the "portable" or "hand-held" electronic device as the "PED" or "first device" throughout this order.  Likewise, the court will refer to the "different electronic device" or the other electronic device to which the PED communicates information as the "second device."  Tr. at pp. 14-18.

specification." *Id.*  Where a claim term has a particular meaning in the field of the art, the court looks to "those sources available to the public to show what a person of skill in the art would have understood [the] disputed claim language to mean.'"  *Id.* at 1314 (quoting *Innova*, 381 F.3d at 1116).  Those sources include "'the words of the claims themselves, the remainder of the speciation, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meanings of technical terms, and the state of the art.'"  *Id.* (quoting *Innova*, 381 F.3d at 1116).

Neither party proposed a definition of a PHOSITA.  Based on the teachings described in the patents, the references cited as examined by the PTO examiners, the testimony of witnesses at prior *Markman* hearings, and a trial involving these patents, the court proposed the following:

> a person of ordinary skill in the art is an individual with the equivalent of a four-year degree from an accredited institution (usually denoted in this country as a B.S. or Bachelor's degree) in Electrical Engineering (EE), Mechanical Engineering (ME), or Computer Science (CS, with at least two semesters of coursework in EE and/or ME), together with at least two years of experience working with, developing, or designing electronic devices with user interfaces. Advanced education in EE, ME, or CS might substitute for some of the experience, while extensive experience in working with, developing, or designing electronic devices with user interfaces might substitute for some of the educational requirements.

The parties agreed without objection to this definition at the hearing.  Tr. at p. 12

## IV.   Claim Construction

**1.  "software … configured to" terms – the means-plus-function dispute**

Defendants argue that several of the claims from the '833 patent are governed by 35 U.S.C. § 112, ¶ 6.  Plaintiff Affinity disagrees.  In brief, Affinity asserts that the drafter did not use "means" or "means for" and therefore a rebuttable presumption exists that § 112, ¶ 6 does

6

not apply.  Doc. # 140, p. 17.  Defendants counter that the presumption is rebutted because the claims recite functional limitations without corresponding structure.  Doc. # 142, p. 16.

The failure to use the word "means" in a claim term creates a rebuttable presumption that the drafter did not intend to invoke 35 U.S.C. § 112, ¶ 6.  *EnOcean GmbH v. Face Intn'l Corp.*, No. 2012-1645, 2014 WL 341040, at *2 (Fed. Cir. Jan. 31, 2014); *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373 (Fed. Cir. 2012).  "[A] limitation lacking the term 'means' may overcome the presumption against means-plus-function treatment if it is shown that 'the claim term fails to recite sufficiently definite structure for performing that function.'"  *Flo Healthcare Solutions*, 697 F.3d at 1373 (quoting *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006)).  However, the presumption is a strong one that is not overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure."  *Id.* at 1374 (citing *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002)).

Defendants cite numerous cases for the general proposition that "software" standing alone is not sufficient disclose of a structure to escape a means-plus-function construction.  Doc. # 142, pp. 16-17.  Defendants' cases are distinguished from the present case because in each of them, the claims used the term "means" or the parties agreed that that claim was governed by § 112, ¶ 6.[4]  The mere presence of the words "software" or the words "software … configured to" does not provide a bright-line test for the applicability of § 112, ¶ 6, nor invoke

---

[4] One of the cases included two claims without the term "means" that were determined to fall within § 112, ¶ 6; however, those claims were identical to other claims in the patent that did contain "means," except that "means for" was replaced with "computer," and the court analyzed them in the same manner.  *Soque Holdings, LTD v. Keyscan, Inc.*, No. C 09-2651 MHP, 2010 U.S. Dist. LEXIS 60501, at *38(N.D. Cal. June 4, 2010).

any presumptions.  *See Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1231-32 (N.D. Cal. 2001) (holding that "computer code that [performs X function]" is not governed by § 112, ¶ 6).

"A claim that recites 'computer code' for performing a specific function is analogous to a claim that recites a 'circuit' for performing a specific function." *Aloft Media, LLC v. Adobe Sys. Inc.*, 570 F. Supp. 2d 887, 897 (E.D. Tex. 2008).  Like "circuit," "computer-code" or software is a structure-connoting term to one of skill in the art, the definition of which was available in standard dictionaries at the time of the application of these patents.  *The IEEE Standard Dictionary of Electrical and Electronics Terms* 1006 (6th ed. 1990).  Determining whether § 112, ¶ 6 controls, requires a determination of whether the claim language conveys to one of ordinary skill in the art a sufficient description of the operation of the software.  *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004).

      *A. Claim 1*

Defendants point to several claims that have a term or terms that include the phrase "software … configured to."  The first of these is found in Claim 1:

> **a first portion of <u>software</u> saved at the portable electronic device and <u>configured to</u> initiate a displaying of a graphical user interface item on the display, the graphical user interface item comprising a name associated with an audio file saved in the memory.**

'833 patent, col. 18, ll. 39-43.

This claim term does not use the word "means" or any of the other terms that have been treated as synonymous, including "element," "device," and "mechanism."  *See Mass. Inst. of Tech.*, 462 F.3d, at 1354.  As "means" is not used, there is a strong presumption that this is not a means-plus-function claim.  Defendants bear the burden rebutting this presumption.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).

Defendants fail to meet this burden because they have not provided the court with any basis for concluding that this phrase is so devoid of structure that it would not sufficiently describe the function of the software to one of ordinary skill in the art.  *See CCS Fitness, Inc.*, 288 F.3d at 1369.  The parties agreed to the court's construction that "portable electronic device" means "an electronic device that can be easily moved by a user from one location to another and that can be operated in a mobile environment independent of, or untethered to, another system," and that "graphical user interface" means "a presentation that contains selectable graphics, for example, text or icons."  Doc. # 161.

The "software" described in this claim is not devoid of structure: it initiates a display on the graphical user interface consisting of at least a name associated with an audio file saved in the memory of the personal electronic device.  The use of the term "software," coupled with a description of the software's operation is sufficient structure to avoid a means-plus-function construction.  *See Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 810 (E.D. Tex. 2011).

Defendants' argument that the specification lacks a sufficient algorithm puts the cart before the horse.  Defendants cannot point to a lack of an algorithm in the specification to sidestep their failure to meet their burden in showing that this is a means-plus-function claim.  If the claim itself does not use "means," and if it describes sufficient structure, then the court does not look to the specification for structure.

Defendants also argue that several other claims contain "software … configured to" and are therefore subject to § 112, ¶ 6.  Defendants make no specific arguments about the other claims in their briefing.  Instead, they rest on the arguments discussed above for all of these

9

claims.  But all of these claims, as discussed below, describe sufficient structure to avoid a means-plus-function analysis.  For example, another limitation of claim 1 states:

> **an other portion of <u>software</u> saved at the portable electronic device and <u>configured to</u> communicate a representation of the graphical interface item to the different electronic device via the physical interface to facilitate a displaying of the representation on the associated display, wherein the portable electronic device is configured to communicate interface information to the different electronic device in order to allow a user to view at least a partial representation of a graphical user interface that includes the graphical interface item on the associated display.**

'833 patent, col. 18, ll. 49-59.  Again, Defendants have failed to meet their burden in showing this claim is devoid of structure.  The software described here communicates a representation of the graphical user interface item to the different electronic device and allows the user to view some portion of that information.  This is a sufficient description of the software's operations to avoid a means-plus-function analysis.

### 3. *Claim 2*

Claim 2 states:

> **the other portion of <u>software</u> is further <u>configured to</u> communicate a collection of information to the different electronic device via the physical interface such that a user can utilize the different electronic device to navigate through a plurality of audio files.**

'833 patent, col. 18, ll. 62-67.  The claim describes software that communicates a collection of information from one device to the other, to allow the user to access information.  Again the absence of "means" or its equivalent raises the presumption that there is not a means-plus-function claim.  The operation of the software described in the claim, simple communication of data from one device to another, provides sufficient structure to avoid a means-plus-function construction.

### Claim 16

Another claim for which Defendants provide no specific or different analysis is claim 16. The relevant portion of claim 16 states:

> the other portion of <u>software</u> is further <u>configured to</u> communicate a collection of information to the different electronic device via the physical interface such that the user can utilize the different electronic device to select an audio information source that is an audio file saved in the memory.

'833 patent, col. 19, ll. 41-46. Similar to claim 2, this claim describes software that communicates information between devices to allow the user to select audio information. The claim language is not so devoid of structure to fall within § 112, ¶ 6.

### Claim 17

Defendants also assert that two portions of claim 17 are means-plus-function claims. The first portion states:

> <u>software</u> saved at the portable electronic device and <u>configured to</u> direct the portable electronic device to save an audio file in the memory, to associate the audio file with a name, to include the name in a graphical menu of available content, to present the name on the display of the portable electronic device, and to communicate a collection of information comprising the name to a different electronic device that has an associated display such that a user can interact with the different electronic device: (1) to navigate through a plurality of audio files; (2) to view at least a portion of the graphical menu on the associated display, wherein the portion comprises the name; and (3) to select an available audio file for processing.

'833 patent, col. 19, ll. 50-63. This claim contains a list of functions and a numbered list of actions a user will be able to perform with the devices. Short of providing actual code in the claim, it is unclear what more structure Defendants could claim to be necessary. Defendants have failed to meet their burden.

The other portion of claim 17 that Defendants argue is subject to § 112, ¶ 6, states:

> **the portable electronic device is configured to communicate interface information to the different electronic device in order to allow the user to view the graphical menu on the associated display in a graphical user interface that includes a plurality of preprogrammed soft buttons that are linked to respective audio information source.**

'833 patent, col 19, l. 64 to col. 20, l. 3.  Defendants did not point to a word or phrase in this claim that is synonymous with "means" in this claim.  There is a presumption that § 112, ¶ 6 does not apply.  Unlike the other claims, this claim phrase does not use the word "software."  As noted above, Defendants only provided analysis and arguments for the first term of claim 1.  But one of skill in the art would know that a PED "configured to" perform the listed actions would have software allowing the device, in this case, to view graphical menus.  As they have failed to show even that, this claim is not subject to a means-plus-function analysis.

*2. Conclusion for §112, ¶ 6 Arguments*

Defendants have attempted to stretch the boundaries of § 112, ¶ 6 to cover any claim that describes "software."  This is not supported by logic or precedent interpreting means-plus-function claims.  Defendants bear the burden in this matter and have not met it for any of the claims.

**2.   "to associate the audio file with a name" '833 Patent, Claim 17**

In an earlier case, *Affinity v. BMW*,[5] the court previously construed this term as:

> to recognize an existing connection or to establish a connection between the electronic data representing the audio file and the electronic data representing the name

---

[5] *See Affinity Labs of Tex., LLC v. BMW N. Am.*, LLC, 9-08-cv-164, Doc # 326 (construing the '833 patent), Doc. # 386 (construing the '228 patent) (hereinafter "*Affinity v. BMW*").

Affinity argues that the court should adopt its previous construction.  Doc. # 140, p. 20. Defendants seek to remove the "to recognize an existing connection" language from the construction, arguing that the narrower construction better comports with the specification.  Doc. # 142, p. 21.  The central argument is whether the construction should exclude a preexisting connection between the name and audio file.

### A. *Intrinsic Evidence*

With respect to claim 17, nothing in the intrinsic evidence requires that all associations between an audio file and a name be created by the PED.  Claim 17 simply states that the PED contains software "configured to" associate an audio file and a name; the claim does not state that the PED must perform all such associations.  *See* '833 patent, col. 19, ll. 49-52 (claim 17).

Defendants' proposed construction would exclude an embodiment of the invention that was relied upon to support the claimed invention during prosecution.  *See* '833 Patent fig.4 (showing radio dial 412, including a "user selected playlist," which may include associations between an audio file and a name, displayed on a computer before it is transferred to the PED). Defendants here, as the defendants in the previous case, argue that claim 1 is broader than claim 17, and therefore this embodiment could fall within claim 1, even if it fell outside claim 17. Even if that were the case, claim terms should be interpreted consistently throughout various claims of the same patent.  *See Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1371-72 (Fed. Cir. 2005).

### B. *Extrinsic Evidence*

The ordinary and customary meaning of "to associate" at the time of the invention would include both the creation of a connection, and the recognition of a preexisting connection.

*Microsoft Computer Dictionary* 38 (5th ed. 2002) (defining "associate" as "[t]o inform the operating system that a particular file name extension is linked to a specific application").

### 2. Conclusion

"**to associate the audio file with a name**" means "**to recognize an existing connection or to establish a connection between the electronic data representing the audio file and the electronic data representing the name.**"

## 3. The "playing" terms, '228 Patent, Claims 1, 9, and 12

      a.   "**playing the media file**" '228 patent, claim 1

      b.   "**outputting a played version of the media file**" '228 patent, claims 1 and 9

      c.   "**a/the playing of the media file at the portable electronic device**" '228 patent, claim 9, 12

The disputed "playing" terms appear in five limitations in the asserted '228 claims. The parties focused on the first of the five limitations, "playing the media file."

Plaintiff has argued that the court should adopt its previous construction:

"**playing the media file**" means "processing data in the media file into an electronic signal that the different electronic device can use to produce sound and/or visual images."

Doc. # 140, at 24-25; *Affinity v. BMW*, Doc # 385, at *25.

Defendants argued for two changes to the construction of this term.[6] First, they want to replace "electronic signal" with "audio/video signal." Second, they want to add the limitation that "[m]erely copying, transferring, streaming, or formatting a media file from the portable electronic device to the different electronic device is not playing the media file." Doc. # 142 at p. 27.

_____

[6] Defendants briefed a third change, arguing that "can use" should be replaced with "uses." Doc. # 142 at p. 27. At the hearing, all of the parties agreed that the previous construction of "can use" was acceptable. Tr. at pp. 41-43.

It is important to recognize that this dispute is different than the arguments before the court in the previous case. *Affinity v. BMW*. In the earlier case the parties focused on whether the signal from the PED (first device) to the different device (second device) was analog or digital. For the reasons stated in that claim construction order, this court determined the signal could be analog or digital. *Affinity v. BMW*, Doc. # 386, at 16-26.[7] The parties here agree that the signal from the PED to the other device can be analog or digital. Tr. at p. 25.

The present dispute is whether the signal from the PED to the second device should be further limited to an audio/visual signal. Defendants are also concerned that the previous construction of "electronic signal" could be read as including transmission of a mere copy of the compressed MP3 file from the PED to the second device.

## A.   The Claim Language

The '228 patent claims describe a method or system wherein an audio or media file is "played" by the PED, and the PED sends a "played version" of the file to the other electronic device, which can then "output" the played version. *See* '228 patent, col. 18, ll. 21-29 (describing "playing the media file by the portable hand-held device" and "outputting a played version of the media file across a physical interface of the portable hand-held device … wherein the physical interface is configured to facilitate a communicative coupling of the portable hand-held device and the different electronic device."); *id.*, col. 19, ll. 63-66 (describing "a playing of the media file by the portable electronic device … so that the playing of the media file can be output via the sound system."); *id.*, col. 20, ll. 48-50 ("the audio file can be played by the portable electronic device and to be output via the [other] electronic device"). Thus, the act of

-------

[7] To the extent any questions about that issue remain, the court incorporates those pages into this order.

"playing" takes place at the PED, and the different electronic device then uses the "played version" or "the playing of the media file" to emit audible sounds or display visible images.

### B.   The Specification

The '228 patent specification indicates that, with respect to audio files, "playing" involves processing audio information into an "audio signal."  *See* '228 patent, col. 7, l. 65 to col. 8, l. 2.  (referring to Figure 3 "In one embodiment, electronic device **300** may be operable as an audio player configured to play digital representations of music.  For example, electronic device **300** may also include an MP3 player operable to process the received audio information into an audio signal.  Therefore, electronic device **300** may be used to receive wirelessly communicated MP3 audio files and play these files using an MP3 player when desired").

The specification does not provide any detail about how video signals are played, but does state that "[o]ne skilled in the art can appreciate that other types of information, such as video, textual, etc., may be communicated utilizing the systems and methods disclosed herein without departing from the spirit and scope of the present invention."  '228 patent, col. 3, ll. 7-11.  Unless compelled to do otherwise, the court should give a claim term the full range of its ordinary meaning as understood by a PHOSITA.  *Rexnord*, 274 F.3d at 1342.  The intrinsic evidence does not compel changing "electronic signal" to "audio/visual signal."  Defendant points to nothing compelling in the extrinsic evidence either.  Defendant's request for this change is not well taken.

The court must still deal with the dispute over exactly what "playing" means.  The specification makes a distinction between communicating information and "playing" a file.  *See* '228 patent, col. 15, ll. 16-17 ("the method could format the information such that the information may be wirelessly communicated and subsequently played by the MP3 player").

16

Guidance is provided by the claims of U.S. Patent No. 7,187,947, which is the parent of both patents-in-suit.  This usage is relevant because "the same term or phrase should be interpreted consistently where it appears in claims of common ancestry."  *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030 (Fed. Cir. 2002).

Claim 24 of the '947 patent describes a method "enabling access to a streaming media source in response to a selection of the icon; detecting selection of the icon; and receiving a wirelessly communicated collection of data packets representing a media stream output by the streaming media source."  Claim 25, which depends on Claim 24, then describes a method "further comprising playing the wirelessly communicated collection of data packets in order to present the media stream."  These claims terms indicate that the inventor did not use "playing" interchangeably with either "streaming" or "communicating."

## C.  Prosecution History

References cited in the prosecution history provide guidance as to what steps are involved in converting a stored audio file into audible sounds of these related patents.  For instance, during the prosecution of the '947 patent,[8] the examiner cited U.S. Patent No. 6,721,710 to Lueck ("the '710 patent"). [*See Affinity v. BMW*, Doc. #362 Ex. N, Nov. 21, 2005 Office Action at 7.] The '710 patent discloses a "hardware platform . . . for playing digital audio files . . . [that] may be in various compressed and/or encoded formats."  U.S. Patent No. 6,721,710, col. 2, ll. 64-68 (filed Oct. 17, 2000).  This platform includes a flash memory in

---

[8] The '228 patent is a continuation of the '947 patent, which also contains claims directed toward the playing of media files.  *See, e.g.*, U.S. Patent No. 7,187,947, col. 20, ll. 40-41 (filed Mar. 28, 2000) (describing a device "comprising a media player configured to play user selected media").  When there is similarity between the claims of the patents-in-suit and the claims of a parent application, the prosecution history of the parent application may be "highly instructive."  *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007).

which audio files are stored.  *See* '710 patent, col. 3, ll. 49-53. It also includes a digital signal processor ("DSP") that may be loaded with a decoder program for decoding the type of audio format of the audio file desired to be played. *See* '710 patent, col. 3, ll. 62-65.

The DSP decodes stored audio files and "provides an audio bit stream to a stereo digital-to-analog converter [that] converts the digital signals [from the DSP] to an analog equivalent." '710 patent, col. 3, ll. 3-5; id., col. 3, ll. 29-31.  The analog signal produced by the digital-to-analog converter is then provided "to an output device such as speakers, a set of earphones, or some other device for converting the electrical signal to an audible signal."  '710 patent, col. 3, ll. 33-35.  Thus, in the '710 patent, an audio file is first converted into a digital signal by the DSP, then converted into an analog signal by the digital-to-analog converter, then sent to a set of speakers that output audible sounds.

Similarly, a reference cited by the applicants during prosecution of the '228 patent, U.S. Pub. No. US 2005/0054379 A1 to Cao, et al., discloses a cordless telephone that allows a user to play a digitized musical audio stream (e.g., MP3 digital audio stream)."  *Affinity v. BMW*, Doc. #362 Ex. S, Cao at ¶ 0019.  In this reference, the playing is accomplished by reading an MP3 digital audio bit stream stored in flash memory to a DSP that decodes the MP3 digital audio bit stream; after decoding by the DSP, the bit stream is converted into an analog signal using a digital-to-analog converter.  *See* Cao at ¶ 0055.  Thus, as in the '710 patent, an audio file or an "audio bit stream" is first "decoded" by a DSP, and then converted into an analog signal by a digital-to-analog converter.

### D.  Extrinsic Evidence

Extrinsic evidence indicates that one of skill in the art would understand that "MP3 player" can mean a piece of software that decodes compressed MP3 files.  MP3 audio files are

compressed audio files that are created by running uncompressed files through an MP3 "encoder"; the tool or software used to play an MP3 file is called a "decoder" or an "MP3 player." *See* Scot Hacker, *MP3: The Definitive Guide* 2 (1st ed. 2000).  This understanding of "MP3 player" is consistent with how that phrase is used in the '228 patent specification, *See* '228 patent, col. 7, l. 67 to col. 8, l. 4 ("[E]lectronic device **300** *may* also include an MP3 player operable to process the received information into an audio signal.  [E]lectronic device **300** may be used to . . . play [MP3] files *using an MP3 player when desired*" (emphasis added)); *cf. Wiley Electrical and Electronic Engineering Dictionary* 485 (2004) ("MP3 player" means either "[a]n application which plays MP3 files" or "a device, such as a palm-sized digital audio player, which plays MP3 files").

In the year 2000, an MP3 playback device could be hooked up to a stereo either via analog ports, or through digital outputs to an "outboard" digital-to-analog converter.  *See* Hacker, supra, at 210 ("[D]igital bits need to be converted into analog signal at some point in the chain. The question is whether this job is done by a . . . built-in DAC . . . or by a higher-quality DAC in a digitally equipped amplifier, DAT, or outboard DAC."); *see also id.* at 212-14 (noting that digital input jacks became common on amplifiers sold in the late 1990s, further noting that it was possible to obtain an MP3 playback device with digital outputs, and describing various digital connection  types including S/PDIF); *id.* at 234-35 (giving advice on how to choose the best "external MP3 player," and noting that "if you have a digital amplifier or DAC, look for a unit with optional digital outputs").

### E.  Other Extrinsic Evidence – Prior Statements By Affinity

During the claim construction of this patent in the earlier case, Affinity's counsel made numerous statements about how "playing" should be construed.  While much of that debate

focused on whether the signal had to be analog, the discussion provided clarification as to whether the signal could merely remain as an MP3 file.

During the previous *Markman*, Affinity stated "the specification teaches that 'play' is being used in its ordinary sense in that the media file must be 'executed' or 'processed into an audio signal' by a player that is capable of reading and decompressing the particular format of the stored audio file." *Affinity v. BMW*, Doc # 363, at 4.  Affinity's counsel, when asked if streaming was the same as playing, stated that "[w]e're definitely not talking about streaming as a synonym." *Affinity v. BMW*, Markman Hearing Transcript, Doc. # 384, at 131.

Affinity's counsel has repeatedly stated, both in this proceeding and in the prior proceeding that mere "copying" and "transferring" alone are not "playing."  Affinity is judicially estopped from taking contrary positions as to both factual assertions and legal conclusions made at the prior hearing.  *See Ergo Science, Inc. v. Martin*, 73 F.3d at 598.

### F.  Conclusion - "playing" terms

The court finds that a person of ordinary skill in the art at the time of the invention would understand that "playing" in the '228 patent means "processing data in a media file into an electronic signal," and that this "electronic signal" is the "played version" or "the playing of the media file" that is sent from the PED to the second electronic device to be output as audible sounds or visible images.

This construction does not encompass something as simple as "copying" or otherwise "processing" an MP3 file into an MP3 file.  *Affinity v. BMW*, Doc. # 384, p. 80, ll. 9-16.  Affinity agrees that "playing" involves more than merely copying the audio or media file and sending it from the PED to the second electronic device.  *Affinity v. BMW*, Doc. # 384, p. 51, l. 22 to p. 52, l. 4; p. 99, ll. 13-23.  Further, this construction does not encompass all types of "processing" of

an audio or media file; it is limited to processing the audio or media file into an electronic signal that the second electronic device can use to produce sound or images.

As discussed above, with respect to an MP3 file, "playing" involves more than just creating a copy—it involves decoding the MP3 file into an uncompressed signal. *See* Ken C. Pohlmann, *Principles of Digital Audio* 484 (3d ed. 1995) (DSP can be used to "generate signals in the digital domain"); *id.* at 486 (DSP can perform processing such as sample rate conversion, error correction, volume/fader/balance, filtering, etc.).

To avoid further dispute, the court further finds that, with respect to audio files, a person of ordinary skill in the art would understand that an "audio signal" could be an analog signal suitable for output through speakers, or could be a digital signal that must be converted by a digital-to-analog converter before being output through speakers. This is particularly true of MP3 files, where one of skill in the art would understand that an "MP3 player" can be a software application that "decodes" compressed MP3 files, the result of which could be a digital audio signal. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) (where claims can reasonably be interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence to the contrary); '228 patent, col. 7, l. 65 to col. 8, l. 4 (describing embodiment wherein an electronic device "includes an MP3 player"). Therefore, the court construes the playing terms as follows:

    a.  "**playing the media file**" means "**processing data in the media file into an audio and/or video signal that the different electronic device can use to produce sound and/or visual images.**"

    b.  "**outputting a played version of the media file**" means "**sending, by the portable hand-held device, an audio/video signal that results from processing data in the media file.**"

c. "**a/the playing of the media file at the portable electronic device**" means "**a processing of data in the media file into an audio and/or video signal that the sound system can use to produce sound and/or visual images**."

To avoid disputes by experts at trial, or attempts by counsel to claim a "lack of understanding" by the court, based on the references and the representations by counsel cited above, notes that "data processing" is being used, and  is defined, as set out in a standard technical dictionary used by a PHOSITA.  *The IEEE Standard Dictionary of Electrical and Electronic Terms*, 255 (6th ed. 1996).  In each of the terms "**processing data**" means "**the systematic performance of operation upon data, such as data manipulation, merging, sorting, and computing that accomplishes something other than merely copying and/or transferring of the file or data.**"

**4.   "communicate a collection of information" '833 Patent, Claims 2, 16, 17**

a.   "The system of claim 1, wherein the other portion of software is further configured to **communicate a collection of information** to the different electronic device via the physical interface such that a user can utilize the different electronic device to navigate through a plurality of audio files."  '833 patent, claim 2

b.   "The system of claim 1, wherein the other portion of software is further configured to **communicate a collection of information** to the different electronic device via the physical interface such that the user can utilize the different electronic device to select an audio information source that is an audio file saved in the memory."  '833 patent, claim 16

c.   "software saved at the portable electronic device and configured to direct the portable electronic device to save an audio file in the memory, to associate the audio file with a name, to include the name in a graphical menu of available content, to present the name on the display of the portable electronic device, and to **communicate a collection of information** comprising the name to a different electronic device that has an associated display such that a user can interact with the different electronic device: (1) to navigate through a plurality of audio files; (2) to view at least a portion of the graphical menu on the

associated display, wherein the portion comprises the name; and (3) to select an available audio file for processing;" '833 patent, claim 17

The parties dispute whether the "communicate a collection of information" terms need to be construed.  Affinity argues that the terms may be given their plain and ordinary meaning. Defendants argue that they require construction.  Doc. # 140 at p. 7.  Defendants propose "send data and related instructions to the different electronic device necessary for the user to use the different electronic device to perform the claimed functions."  Doc. # 142 at p. 11.

The Federal Circuit has stated that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *O2 Micron Int'l v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (emphasis original).  When the meaning "is clear in the context of the claim" and "will be readily understandable to the jury," no construction is necessary, particularly when the court has addressed the concerns of the party seeking construction with other claim terms.  *SFA Sys., LLC, v. 1-800-Flowers.com, Inc.*, 940 F. Supp. 2d 433, 442 (E.D. Tex. 2013) (citing *O2 Micron Int'l*, 521 F.3d at 1362).  Finally, "[t]here is no reason to import claim limitations that are not required by the claim language or the intrinsic record."  *SFA Sys., LLC*, 940 F. Supp. 2d at 442.

The parties have agreed that "information" is facts or instructions.  Doc. # 161.  The language in the claims describes the facts or instructions that will be communicated.  The meaning of "communicate a collection of information" is clear from the context of each of the claims in question.  In claim 2, the collection of information being communicated is the information needed so that "a user can utilize the different electronic device to navigate through a plurality of audio files."  '833 patent, col. 18, ll. 65-67.  In claim 16, the collection of information being communicated is the information needed so that "the user can utilize the

23

different electronic device to select an audio information source that is an audio file saved in the memory." '833 patent, col. 19, ll. 44-46.

In claim 17, the collection of information comprises "the name to a different electronic device that has an associated display such that a user can interact with the different electronic device: (1) to navigate through a plurality of audio files; (2) to view at least a portion of the graphical menu on the associated display, wherein the portion comprises the name; and (3) to select an available audio file for processing." '833 patent, col. 19, ll. 55-63.  When read in light of the claims as a whole, rather than in isolation as Defendants seem to suggest, the jury will readily understand the meaning of "communicate a collection of information."  Therefore, it needs no construction.

**5.   "Remains stored on the portable hand-held/electronic device" term**

      a.   "**while the media file remains stored on the portable hand-held device**"
         '228 patent, claim 1

      b.   "**while the media file remains stored at the portable electronic device**"
         '228 patent, claim 9

The disputed "remains stored" terms appear in three of the claims of the '228 patent. Plaintiff Affinity argues that the terms need no construction, whereas Defendant seeks a construction that includes a limitation against copying, moving, or transferring the file from the portable electronic device. The parties both agree that these terms are related to the "playing" terms.  Doc. # 140 at p. 25; Doc. # 142 at p. 34.

It is difficult to see how Defendants' argument is anything but an attempt to impose costs on Plaintiff by multiplying the issues raised.[9]  The audio or media file itself remains stored on the PED throughout the "playing" process.  *See* '228 patent, col. 18, ll. 24-27 ("the media file remains stored on the portable hand-held device" while the "played version" is sent to the different electronic device); *id.*, col. 19, ll. 65-67 ("the media file remains stored on the portable electronic device" while "the playing of the media file" is output via the sound system); *id.*, col. 20, ll. 48-51 ("the audio file remains stored on the portable electronic device" while the other electronic device outputs the played audio file).

The Federal Circuit has stated that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *O2 Micron Int'l*, 521 F.3d at 1362 (emphasis original).  When the meaning "is clear in the context of the claim" and "will be readily understandable to the jury," no construction is necessary, particularly when the court has addressed the concerns of the party seeking construction with other claim terms.  *SFA Sys., LLC, v. 1-800-Flowers.com, Inc.*, 940 F. Supp. 2d 433, 442 (E.D. Tex. 2013) (citing *O2 Micron Int'l*, 521 F.3d at 1362).  Finally, "[t]here is no reason to import claim limitations that are not required by the claim language or the intrinsic record."  *SFA Sys., LLC*, 940 F. Supp. 2d at 442.

Defendants provide no legally sound reason for reading a limitation against copying into the "remaining stored" language of the claims.  Neither the plain meaning of "remaining stored" nor any of the evidence put forth by Defendants required a construction that includes a limitation

---

[9] The recent decisions in *Octane Fitness* and *Highmark* may affect the analysis of whether such a strategy continues to be advantageous.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014); *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744 (2014).

against copying, or indeed, any construction at all.  Therefore, the court does not construe the "remaining stored" terms.  They shall be given their plain and ordinary meaning.

### 6.   "a/the graphical menu" '833 Patent, Claim 17

The parties dispute the necessity of construing "a graphical menu" and "the graphical menu from claim 17 of the '833 patent.  The relevant portion of claim 17 states:

> software saved at the portable electronic device and configured to direct the portable electronic device to save an audio file in the memory, to associate the audio file with a name, to include the name in **a graphical menu** of available content, to present the name on the display of the portable electronic device, and to communicate a collection of information comprising the name to a different electronic device that has an associated display such that a user can interact with the different electronic device: (1) to navigate through a plurality of audio files; (2) to view at least a portion of **the graphical menu** on the associated display, wherein the portion comprises the name; and (3) to select an available audio file for processing

'833 patent, col. 19, ll. 50-63.  Affinity argues that these terms should be given their plain and ordinary meaning.  Doc. # 14 at p. 7.  Defendants counter that "a graphical menu" should be construed as "a collection of selectable functions or features, displayed in a graphical form" and that "the graphical menu" should be construed as "the graphical menu from the portable electronic device displayed in the same graphical form."  Doc. # 142 at p. 6.

The plain and ordinary meaning of menu is a list of selections.  *See* menu, *Merriam-Webster*, http://www.merriam-webster.com/dictionary/menu (last visited April 16, 2014) (defining menu as "a list of things that you can choose from; *especially* computers: a list shown on a computer from which you make choices to control what the computer does" (emphasis original)); menu, *Oxford Dictionaries*, http://www.oxforddictionaries.com/us/definition/

american_english/menu?q=menu (last visited April 16, 2014) (defining menu as "[a] list of commands or options, especially one displayed on screen").  The plain and ordinary meaning of menu addresses the first portion of Defendants' proposed construction.

Defendants then make a circular argument that a graphical menu must be in graphical form and that Affinity does not contest this.  Doc. # 142 at p. 7.  It is hard to imagine that either Affinity could contest, or that a reasonable jury could be confused, that a graphical menu must be in a graphical form.  As the meaning of "a graphical menu" and "the graphical menu" is clear from the context of the claim, and readily understandable by the jury, that term requires no construction.  *See SFA Sys., LLC*, 940 F. Supp. 2d at 442.

**7.  The "configured to communicate" terms**

    a.  "**configured to communicate a representation of the graphical interface item to the different electronic device via the physical interface to facilitate a displaying of the representation**" '833 patent, claim 1

    b.  "**configured to communicate interface information to the different electronic device in order to allow a user to view at least a partial representation of a graphical user interface**" '833 patent, claim 1

    c.  "**configured to . . . communicate a collection of information . . . such that a user can interact with the different electronic device . . . to view at least a portion of the graphical menu on the associated display**" '833 patent, claim 17

    d.  "**configured to communicate interface information to the different electronic device in order to allow the user to view the graphical menu on the associated display in a graphical user interface**" '833 patent, claim 17

The parties originally disagreed as to whether these phrases, in their entirety, required construction.  Defendants argued that the phrases need not be construed, other than the constructions "graphical interface item," "physical interface," and "graphical user interface." The parties agreed to the construction of "graphical user interface."  Doc. # 161.  Plaintiff

originally requested that the previous constructions be used.  During the *Markman* hearing, the

parties agreed that only the "**configured to communicate**" portion of the claim needed to be

construed and that an appropriate construction of it was "**able to send information necessary**."

Tr. at pp. 183-84.  The terms "graphical interface item" and "physical interface" are discussed

below.

**8.   "graphical interface item" '833 Patent, Claim 1**

The parties dispute the need for construction of "graphical interface item."  The relevant

portion of the claim of the '833 patent states:

> a first portion of software saved at the portable electronic device and configured
> to initiate a displaying of **a graphical interface item** on the display, **the
> graphical interface item** comprising a name associated with an audio file saved
> in the memory … an other portion of software saved at the portable electronic
> device and configured to communicate a representation of **the graphical
> interface item** to the different electronic device via the physical interface to
> facilitate a displaying of the representation on the associate display

'833 patent, col. 18, ll. 39-43.  The parties have agreed that "graphical user interface" means "a

presentation that contains selectable graphics, for example, text or icons."  Doc. # 161.  During

the course of the *Markman* hearing, Defendants engaged in a lengthy discussion as to whether

text was graphical and if every detail needed to be the same, including whether if the font in the

first instance was san-serif, did it have to be in the second instance.  Tr. at 142-44.  This dispute

is nearly identical to the discussion in Section 6 above of whether the display on the different

electronic device must be identical in format, as well as in substance, to the original display.  As

with the discussion above of the graphical menu, this appears to be nothing more than attempt to

construe around the infringing product.  Given that the parties have agreed on the "graphical user

interface" means "a presentation that contains selectable graphics, for example, text or icons," this term requires no further construction.  Doc. # 161.

### 9.  "mounting location" '833 Patent, Claims 1 and 23

> d.  "a **mounting location** on the portable electronic device that includes a physical interface configured to communicatively couple the portable electronic device to a different electronic device having an associated display" '833 patent, claim 1

> e.  "The system of claim 17, further comprising a **mounting location** on the portable electronic device that includes a physical interface configured to communicatively couple the portable electronic device to the different electronic device" '833 patent, claim 23

The parties dispute the mean of the phrase "mounting location."  Plaintiff asserts that it needs no construction.  Doc. # 140 at p. 21.  Based on the discussions at the *Markman* hearing, Defendants proposed that "mounting location" means "a structure on a portable electronic device in addition to the physical interface designed to cooperate with a mount."  Tr. at p. 129.

The use of "mounting location" in claims 1 and 23 is nearly identical.  In both uses, it is unambiguously described as being on the PED.  '833 patent, col. 18, l. 44 ("mounting location on the portable electronic device"); '833 patent, col. 20, ll. 20-21(same).  Defendants request to include "on a portable electronic device" is superfluous and makes the claim as a whole more unclear.

Both claims use "includes," which is synonymous with "comprise."  *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1377 (Fed. Cir. 2004).  The use of an open-ended transitional phrase in describing "mounting location" requires that it contain at least a physical interface.  '833 patent, col. 18, ll. 44-45 ("a mounting location on the portable electronic device that

includes a physical interface"); '833 patent, col. 20, ll. 20-22 (same).  The mounting location

could contain only the physical interface, or could include any number of other elements.

The phrase "mounting location" does not appear in the specification.  The specification

does discuss "mount," which both parties agree is a related term.  While one embodiment, the

textual description of Fig. 9, suggests that the mount and the physical interface are separable, it is

just a single embodiment and not dispositive of the construction of the claim.

The intrinsic evidence does not support Defendants' proposed construction.  Attempting

to place their proposed definition into the rest of the claim language produced an unworkable and

nearly unintelligible result.  The plain language of the rest of the claim makes the meaning of

"mounting location" clear to the jury and therefore it requires no construction.

## 10. "physical interface" '833 Patent, Claim 1, 2, 12, 16, 23 and 24 and '228 Patent, Claims 1 and 6

Defendants argued that "physical interface" means "an electrical surface configured to

electrically couple with a corresponding electrical surface that is different than a cable, plug, or

receptor."  Doc. # 142 at p. 25.  The crux of Defendants' argument for the negative limitation is

that Affinity disclaimed those meanings during the prosecution.  Affinity's position is that this

claim does not require construction and should be given its plain and ordinary meaning.  Doc. #

140 at p. 23.  Affinity stated at the *Markman* hearing that if a construction was necessary, it

should focus on the electronic connection and not include the negative limitation.  Tr. at p. 195.

### A. *The Claim Language*

Each discussion of the physical interface in the claims of the '833 patent requires the

ability to communicate between the devices.  '833 patent, col. 18, ll. 44-47 ("a mounting location

on the portable electronic device that includes a physical interface configured to

communicatively couple the portable electronic device to a different electronic device"); '833 patent, col. 18, ll. 62-67 ("other portion of software is further configured to communicate a collection of information to the different electronic device via the physical interface such that a user can utilize the different electronic device to navigate through a plurality of audio files"). The patent also describes a physical interface that allows power transfer between the devices. '833 patent, col. 19, ll. 24-28 ("the physical interface is further configured to couple the portable electronic device 25 to the different electronic device such that a power supply of the different electronic device provides power to the portable electronic device"); '833 patent, col. 20, ll. 26-29 ("the physical interface is configured to couple a power supply associated with the different electronic device to a local power supply of the portable electronic device"). The language of the '228 patent mirrors the '833 patent, in terms of both communication and power transfer. '228 patent, col. 18, ll. 47-52 ("receiving the signal to begin playing via the physical interface of the portable hand-held device; and recharging a battery of the portable hand-held device from a power source electrically coupled to the portable hand-held device via the physical interface.").

      3. *The Specification*

      The specification does not use the phrase "physical interface." The parties both rely on the discussion of Fig. 9 in the '833 patent to support their positions. The relevant portion states:

> Console **900** includes a conventional audio system **901** comprised of a receiver **902** and CD player **903**. Interface **904** may be coupled to audio system **901** via plug **905** and cable **908**, which may be coupled to an auxiliary line into audio system **901**. Interface **904** may also include contact **906** for contacting electronic device **907**. Cable **908** may be a multiple conductive cable for providing power from the automobiles power system via a protection circuit or fuse **909** for powering electronic device **907**.

'833 patent, ll. 40-45. Defendants argued that Interface **904** was the physical interface discussed in the claim language. Tr. at pp. 191-92. Affinity counters that interface **904** is not the physical

interface on the PED, but rather the interface on the other device.    Both description and the figure support Affinity's argument that interface **904** is not on the PED, but rather on the different electronic device.  Additionally, interface **904** "may" be separate from plug **905** and cable **908**, but nothing states that it must be separate.

 2. *Prosecution History*

  Defendants argue that the negative limitation excluding cable, plug, or receptor is justified in light of the modification made to the claim language during prosecution.  "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  Acquiescence to a narrower construction can constitute disclaimer, but the patentee is not required "to fight tooth and nail every possibly adverse thought an examiner commits to paper." *Torpham, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003).  Disclaimer must be "clear and obvious" and "the patentee unequivocally and unambiguously disavows a certain meaning" *Biogen Idec, Inc. v. Glaxosmithkline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013).

  The parties do not dispute that during prosecution, "cable," "connector," and "port" were replaced with "physical interface."  Doc. # 157 at p. 2.  Defendants argued that these changes were made to distinguish this invention from prior art.  Disclaimer by a patentee must be clear and obvious.  While the prosecution history shows a series of rejections and amendments, there is nothing that clearly and obviously indicates that it was the patentee's intent to disavow cable, connector, or port.  If anything, "physical interface" is broader than all of those terms.

b. *Extrinsic Evidence*

Technical dictionaries provide a multitude of possible definitions for interface.  *See The IEEE Standard Dictionary of Electrical and Electronic Terms*, 540-41 (6th ed. 1996).  When considering physical interfaces, the definitions become more limited and useful.  *Id.* at 541 ("Hardware or software that provides a point of communication between two or more processes, persons, or other physical entities.").

2. *Conclusion*

Given the large number of potential definitions for "physical interface," Affinity's position that it does not need to be construed cannot be sustained.  The evidence does not support the negative limitation proposed by Defendants; however, the rest of the construction proposed by Defendants is supported by both the intrinsic and extrinsic evidence.  Therefore, the court construes this term as follows:

"**physical interface**" means "**an electrical surface configured to electrically couple and communicate with a corresponding electrical surface**."

So **ORDERED** and **SIGNED** this **3**  day of **June, 2014.**

_____

Ron Clark, United States District Judge

33